## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LEHIGH HANSON, INC.
300 E John Carpenter Freeway
Irving, Texas  75062

         Plaintiff,

vs.

BNSF RAILWAY COMPANY
2650 Lou Menk Drive
Fort Worth, Texas  76131

CSX TRANSPORTATION, INC.
500 Water Street
Jacksonville, Florida  32202

NORFOLK SOUTHERN RAILWAY
COMPANY
Three Commercial Place
Norfolk, Virgina  23510

*and,*

UNION PACIFIC RAILROAD COMPANY
1400 Douglas Street
Omaha, Nebraska  68179

         Defendants.

Civil Action No:

**JURY TRIAL DEMANDED**

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Lehigh Hanson, Inc. ("Plaintiff" or "Lehigh Hanson") files this Complaint under

the antitrust laws of the United States against Defendants BNSF Railway Company ("BNSF"),

CSX Transportation, Inc. ("CSX"), Norfolk Southern Railway Company ("NS"), Union Pacific

Railroad Company ("UP") (collectively, "Defendants"), and alleges as follows:

## I.  __INTRODUCTION__

1.      This is a civil antitrust action against Defendant railroads and their co-conspirators for violating Section 1 of the Sherman Act, 15 U.S.C. § 1.  Plaintiff is a company that purchased rate-unregulated[1] freight from the Defendant railroads.  Defendants engaged in a price-fixing conspiracy to coordinate their rail fuel surcharge programs as a mechanism for imposing supra-competitive total price increases on their shipping customers from on or about July 1, 2003 until at least December 31, 2008.  As a result of this unlawful conspiracy, Plaintiff seeks damages against Defendants, jointly and severally, as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15, injunctive relief, and such other relief as provided by law.

2.      Defendants conspired to use rail fuel surcharges, which were added to customers' total bills, as a means to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States.

3.      The total freight price for a shipping customer is called the "all-in rate."  This rate consists of a base rate and a fuel surcharge applied as some percentage of the base rate.  The base rate is calculated according to fixed costs such as the cost of organizing a particular shipment, the cost to build and maintain tracks and other structures, and the railroad's markup of price over costs.  A rail fuel surcharge is a separately identified fee that is charged by the railroads for the agreed-upon transportation, supposedly to compensate the railroads for increases in the cost of fuel.  Defendants imposed the rail fuel surcharge as a percentage multiplier of the base rates.  These surcharges raised rates beyond the real increased costs of fuel, which allowed Defendants to collect

---

[1]      "Rate-unregulated" refers to rail freight transportation services in which the rates are set by private contracts or through other means exempt from rate regulation under federal law.

billions of dollars of additional profits during the conspiracy at the expense of Plaintiff and other shippers.

4.      An independent study commissioned by the American Chemistry Council found that through their fuel surcharge programs, Defendants generated revenues from customers that far exceeded their actual increase in fuel costs.  From 2003 to the first quarter of 2007, the study found that railroads collected $11.66 billion in fuel surcharge revenue while costs in fuel rose by only $5.26 billion.  Defendants used these new fuel surcharge programs (which were the result of an unlawful agreement) to generate revenue.

5.      For example, BNSF's annual fuel surcharge revenue increased from about $110.5 million in 2003 to about $357 million, $1.1 billion, and $1.7 billion in 2004, 2005, and 2006, respectively.  CSX increased its fuel surcharge revenue from $76 million in 2003 to about $203 million in 2004, $579 million in 2005, and $1.17 billion in 2006.  NS and UP reaped similar financial benefits from the conspiracy.  NS increased its fuel revenue from about $65 million in 2003 to $184 million in 2004, $609 million in 2005, and then $1.14 billion in 2006.  UP increased its revenue from fuel surcharges from about $93 million in 2003 to about $292 million and $963 million in 2004 and 2005, respectively.  This exponential increase in revenue allowed Defendants to collect billions of dollars of additional profits during the conspiracy.

6.      According to an economic analysis on Railroad Fuel Surcharge practices commissioned by the American Chemistry Council and released in September 2007, Defendants overcharged rail shippers by over $6 billion between 2005 and the first quarter of 2007.

7.      Prior to the conspiracy, Defendants faced a decline in rail freight rates.  Acting on their own, each Defendant had limited success when trying to increase revenue through fuel surcharges.  These pre-conspiracy fuel surcharges were only applied intermittently because

Defendants were concerned about losing business to other railroads that did not apply the fuel surcharges.

8.      In order to increase revenue, Defendants devised and implemented a conspiracy to impose standardized fuel surcharges.  Defendants implemented this conspiracy through various actions that began in 2003, including one or more acts as alleged below.

9.      First, in or about the spring of 2003, Defendants unlawfully agreed to create and apply artificially high, uniform fuel surcharges as a means to raise rates to shippers across the board, and thereby increase Defendants' profits.

10.     Second, shortly after the four Defendants entered into this agreement, two of the Defendants, BNSF and UP (together, the "Western Railroads") announced that they would be using the same fuel surcharge program, resulting in the exact same or similar fuel surcharges. Up until this time, to the extent that railroads were successful in charging shippers a fuel surcharge, the railroads charged different surcharge rates, reflecting that each railroad had different fuel costs.  However, in mid-2003, the Western Railroads agreed to coordinate their fuel surcharges and base them on the U.S. Department of Energy On-Highway Diesel Fuel Price Index (the "HDF Index").  Pursuant to the agreement among all four Defendants, the Western Railroads began charging the exact same or similar fuel surcharges based on the HDF Index from 2003 to 2008.  A few months after the Western Railroads began charging the exact same fuel surcharges, CSX and NS (together, the "Eastern Railroads"), announced that they would apply identical surcharges based on the West Texas Intermediate ("WTI") index.  Previously, the Eastern Railroads had different fuel surcharges.  This announcement by the Eastern Railroads, which came closely on the heels of the announcement by the Western Railroads, was a result of the conspiracy among all Defendants to impose artificially high rail fuel surcharges in a

4

coordinated fashion.  The Eastern Railroads charged the exact same or similar fuel surcharges from 2003 to 2008.

11.     <u>Third</u>, Defendants collectively acted to remove any major obstacles to their plan. One of the most significant obstacles was that as of 2003, most rail freight contracts included rate escalation provisions that <u>already</u> permitted recovery by the railroads of actual fuel cost increases, no matter how large.  In the fall of 2003, Defendants conspired to cause the Association of American Railroads ("AAR") (a railroad trade association in which all Defendants were members and active participants) to establish a new cost escalation index which removed fuel.  As a result of their collective action, Defendants were able to apply new, separate and artificially high rail fuel surcharges to all of their customers as fuel would no longer be covered by standard rate escalation clauses.

12.     <u>Fourth</u>, in furtherance of the conspiracy, Defendants now applied their new fuel surcharges uniformly – as a percentage multiplier of the total base rate for the rail freight transportation.  The old cost escalation indices were designed to reflect that fuel accounted for only a portion of the total rail transport cost.  This new approach allowed Defendants to use the fuel surcharges as "profit centers" to generate a vast amount of revenue that was unconnected to the actual cost of fuel.  Defendants used the generally increasing cost of fuel as a pretextual cover for implementing across-the-board rate increases, allowing them to unlawfully collect billions of dollars in profits.

13.     <u>Fifth</u>, Defendants took other collective actions to enforce the conspiracy and to make it more effective.  For example, they began refusing to negotiate discounts on rail freight rates, even in circumstances in which individual railroads had previously been willing to offer

discounts.  These are some of the collective actions Defendants undertook to make the conspiracy more effective.

14.     The existence of the conspiracy alleged in this Complaint is further supported by the fact that the Surface Transportation Board (which has jurisdiction over only rate-regulated traffic, traffic not at issue in this case) held that "a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs … [The railroads' fuel surcharge program was a] misleading and ultimately unreasonable practice…."

15.     As a direct and proximate result of the price fixing conspiracy described in this Complaint, Defendants have restrained competition in the market for rate-unregulated rail freight transportation services and injured Plaintiff.  Specifically, Plaintiff paid a higher price for unregulated rail transportation services than it would have paid absent the conspiracy.[2]

II.   **PARTIES**

   A.   **Plaintiff**

16.     Lehigh Hanson is a corporation organized under the laws of the State of Delaware with its principal place of business in Irving, Texas.  The reference in this Complaint to Lehigh Hanson refers to Lehigh Hanson, Inc. and each of its affiliates, subsidiary companies, predecessors, and any assignors.  During the time period relevant to these allegations, Lehigh Hanson purchased unregulated rail freight transportation services directly from one or more of the Defendants, and during this relevant period, one or more of the Defendants assessed fuel

_____

[2]     While Plaintiff seeks damages arising from rail freight shipments made under private transportation contracts, it does not seek damages in connection with rate-regulated freight transportation.  The Surface Transportation Board has authority over rate-regulated freight transportation.  In a 2007 decision, the STB found that fuel surcharges as applied to rate-regulated traffic were "unreasonable … [because] a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied."

surcharges on Lehigh Hanson in connection with that unregulated rail freight transportation service.  The prices Lehigh Hanson paid to Defendants for unregulated rail freight transportation services on which fuel surcharges were imposed were higher than they would have been absent the alleged conspiracy.  Lehigh Hanson has therefore been injured in its business and property by reason of Defendants' antitrust violations.

        **B.**    **Defendants**

       17.     Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas  76131.  BNSF is a major freight railroad operating primarily in the western United States.  BNSF has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).  BNSF is defined to include its managers, officers, employees and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, BNSF: directly participated in the conspiracy alleged in this Complaint; directly sold rail transportation services to Plaintiff and others in the United States; and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

       18.     Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water Street, Jacksonville, Florida  32202.  CSX is a major freight railroad operating primarily in the eastern United States and Canada.  CSX has railway lines throughout the eastern United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).  CSX is defined to include its managers, officers, employees and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, CSX: directly participated in the conspiracy alleged in this Complaint; directly sold rail

transportation services to Plaintiff and others in the United States; and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

19.     Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia  23510.  NS is a major freight railroad that operates primarily in the eastern part of the United States.  NS has railway lines throughout the eastern United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).  NS is defined to include its managers, officers, employees and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, NS: directly participated in the conspiracy alleged in this Complaint; directly sold rail transportation services to Plaintiff and others in the United States; and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

20.     Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska  68179.  UP is a major freight railroad operating primarily in the western United States.  UP has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).  UP is defined to include its managers, officers, employees and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, UP: directly participated in the conspiracy alleged in this Complaint; directly sold rail transportation services to Plaintiff and others in the United States; and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

C.     **Co-Conspirators and Agents**

21.     Other entities and individuals not named as Defendants combined, conspired, or agreed with Defendants and committed acts in furtherance of the unlawful conspiracy alleged in this Complaint.

22.     Plaintiff reserves the right to amend this Complaint based on discovery in this case to allege the identities of co-conspirators as they are discovered.

23.     At all times relevant to the allegations in this Complaint, other persons, firms and corporations – referred to as "co-conspirators," the identities of which are presently unknown – have willingly conspired with Defendants in their unlawful scheme as described in this Complaint.

24.     The acts alleged in this Complaint that were done by each Defendant or co-conspirator were fully authorized by each of the Defendants and co-conspirators, or were ordered or committed by duly authorized officers, managers, agents, employees or representatives of each Defendant or co-conspirator while actively engaged in the management, direction, or control of its affairs for that Defendant or co-conspirator.

III.     **VENUE AND JURISDICTION**

25.     This civil antitrust action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, for treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

26.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 & 1337.

27.     Venue is proper in this judicial district pursuant to 15 U.S.C. §15(a) and 22 and 28 U.S.C. § 1391, because during the time period relevant to these allegations, one or more of the Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to each Plaintiff's claims occurred and a substantial

portion of the affected interstate trade and commerce described below has been carried out in this District.

28.     This Court has personal jurisdiction over each Defendant because, among other reasons, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts within this District; and/or (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## IV.   TRADE AND COMMERCE

29.     During the time period relevant to Plaintiff's claims, *i.e.*, the time period relevant to these allegations, Defendants and their co-conspirators engaged in business that affects or is within the flow of interstate or foreign commerce, and the effect of that business on interstate or foreign commerce is substantial.  During the time period relevant to Plaintiff's claims, Defendants accounted for over 90% of all rail shipments within the United States.  In particular, the activities of Defendants and their co-conspirators are within the flow of interstate and foreign commerce or have a substantial effect upon interstate or foreign commerce in that: (a) Defendants and their co-conspirators sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States; (b) data, information, correspondence and/or financial material were exchanged between each Defendant in the State in which each is located, incorporated, or has its principal place of business and other States; and/or (c) money flowed between banks outside of the State in which each Defendant is located, incorporated or has its principal place of business and other States.

30.     The effect of Defendants and/or their co-conspirators' anticompetitive conduct as alleged in this Complaint on United States commerce gives rise to Plaintiff's claims.

## V.    INDUSTRY BACKGROUND

31.    Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 ("Staggers Act").  Prior to the Staggers Act, the Interstate Commerce Commission ("ICC"), heavily regulated the Railroad Industry.  Prior to 1980, railroads could apply to the ICC for across-the-board rate increases, which could be lawfully implemented on a collective basis.  However, after passage of the Staggers Act, railroads were free to set market rates for rail transportation.  Today the STB has replaced the ICC.  The STB now has jurisdiction over rate-regulated rail traffic.

32.    Today, almost forty years after the passage of the Staggers Act, the vast majority of rail shipments (about 80%) move under private transportation contracts.  These shipments are not "rate-regulated."  For all of this rate-unregulated traffic, the railroads cannot turn to a centralized agency to receive across-the-board rate increases.  To the extent that they seek rate increases, they must negotiate those increases in each private contract.

33.    Currently, the railroad industry is highly concentrated.  The four Defendants – BNSF, CSX, NS, and UP – control about 90% of all rail freight track miles.

34.    The Defendant railroads are part of a large, united network.  Class I railroads generally perform shipments over long distances.  There are two basic types of rail traffic: intermodal and carload.  Intermodal traffic travels by rail and one other mode of transportation such as a truck or a boat.  All other rail traffic is considered carload traffic.

35.    While the purpose of deregulation of the railroad industry was to promote competition and lower rates for shippers (such as the Plaintiff in this case), the opposite occurred – faced with declining profits, the railroads sought to charge supra-competitive prices, yielding billions in unlawful profits for themselves.

VI.     **THE PRE-CONSPIRACY PERIOD**

36.     Since the passage of the Staggers Act, railroads had increasingly entered into private freight transportation contracts with their customers that included cost escalation provisions, that were tied to the All Inclusive Index (the "AII"), or the Rail Cost Adjustment Factor ("RCAF").  The RCAF was based on the AII.  Both indices were published by the AAR, and both indices included fuel as a factor.  These indices weighted a number of factors such as, for example, labor, fuel, equipment, rent and interest, so that the actual impact of any particular increases to cost (such as rising fuel increases) would be captured by the index.  In other words, any actual increase in fuel costs, no matter how large, would be reflected in these indices and the railroads would be able to recover their fuel costs.

37.     In the early 2000s, Defendants were faced with sharply declining revenues.  In an effort to increase their revenues, between 2000 and 2003, they undertook various unilateral actions to attempt to generate revenue.  In the early 2000s, Defendants tried to apply stand-alone fuel surcharges to their customers to generate revenue.  However, they quickly realized that they would not be able to generate revenue through this mechanism, at least not without losing business to their competitors.

38.     The wide use of the RCAF and AII made it impossible for Defendants to impose stand-alone fuel surcharges on a majority of their customers.  Defendants were aware that levying a separate fuel surcharge on customers when fuel costs were already covered by the RCAF or the AII would be perceived by customers as double dipping.

39.     Before the conspiracy, Defendants faced difficulties in forcing shippers to accept these original fuel surcharges due to competitive circumstances.  For example, a BNSF internal memo in 2002 stated that: "[t]he trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it.  We do loose [sic] business because of that and

we may have to lower margin in other aspects in order to keep the business with surcharges where we do apply it."

40.    Defendants' own statements reveal that prior to the conspiracy and consistent with the statement above, shippers rarely paid stand-alone fuel surcharges even when there were fuel surcharge provisions in the privately-negotiated contracts.

41.    BNSF's Executive Vice President/Chief Marketing Officer stated that BNSF's fuel surcharge participation rates in January 2003 were "low … [in the] 25 to 30 percent range."  CSX's Executive Vice President of Sales and Marketing noted that "the fuel surcharge revenue [CSX] was generating prior to the adoption of this new program in March 2003 [*i.e.* the conspiratorial program]" was "[l]ow – relatively low to where it needed to be."  The UP CEO also noted that fuel surcharges were rarely implemented prior to the conspiracy: "We had fuel surge [sic] programs in many contracts, but because fuel had not run up, they were never implemented."  He also noted that fuel surcharges triggered "during the 2000 through 2002 time period never reached significant percentage levels."

42.    Defendants realized that they needed to find another way to implement these stand-alone fuel surcharges.  While they could not implement these fuel surcharges unilaterally, they realized that if they colluded with each other, they could get these new surcharges to stick.

43.    As more fully described in this Complaint, in the Spring of 2003, Defendants reached an unlawful agreement to apply a new surcharge program.  They agreed to use rising fuel prices as a pretext to implement an aggressive, standardized, and supra-competitive fuel surcharge on all of their customers.  They also agreed no longer to compete with each other by offering waivers or negotiating discounts to the fuel surcharge program – actions that would be against their self-interest if taken unilaterally and without advance agreement.

## VII.    THE CONSPIRACY

### A.    Defendants Entered into the Unlawful Agreement in the Spring of 2003

44.    From at least the Spring of 2003 and continuing through at least 2008, the top executives at each of the Defendants met regularly at restaurants, recreational facilities and conference facilities under the guise of discussing the railroad industry.  Upon information and belief, at these meetings, they reached an unlawful agreement to impose standardized fuel surcharge programs.  During the conspiracy, they used these meetings to monitor and further discuss the conspiracy.

45.    For example, top executives of Defendants met with each other during annual AAR board meetings.  As alleged earlier, the AAR is an industry trade group that represents the major freight railroads in the United States, Canada and Mexico.  At times relevant to Plaintiff's claims, each Defendant was a member of the AAR.  As the largest Class I railroads in the AAR, Defendants dominated the management of the AAR.

46.    Additionally, these executives regularly met with each other at the biannual National Freight Transportation Association ("NFTA") meetings.  The NFTA is a forum for executives at transportation companies and transportation executives at industrial firms to meet and discuss the transportation industry.  Under the cover of these biannual meetings, Defendants colluded and entered into an unlawful agreement to levy virtually identical stand-alone fuel surcharges.

47.    On March 11, 2003, CSX circulated an internal memorandum that provided for a revised fuel surcharge program that would have reduced the surcharges applied to shippers' (such as Plaintiff's) base rates.

48.    On that same day, across the country, UP's Chief Marketing Officer Jack Koraleski ("Koraleski") issued a "Revised Fuel Surcharge Recommendation" to his company.  Under this

new proposal, Koraleski recommended that UP adopt increased surcharges to shippers, escalating at roughly twice the rate of the formula CSX had internally recommended.

49.     On March 12, 2003, UP's Koraleski traveled to CSX to play golf, to socialize, and to discuss "fuel surcharge methodology" with CSX's VP of Marketing and Sales, Clarence Gooden ("Gooden").  The suggested agenda of the meeting noted that the two individuals had previously discussed "fuel surcharge methodology."

50.     Within one week of the meeting between UP and CSX, CSX did an about-face. CSX abandoned the revised fuel surcharge program it had been contemplating on March 11, 2003 (which would have reduced fuel surcharges), and adopted the aggressive escalation formula laid out in UP's Revised Fuel Surcharge Recommendation.

51.     On March 31, 2003, nearly ten days later, UP formally adopted the same program, making official the policy that Koraleski had circulated to UP on March 11, 2003.

52.     This was not an instance of UP merely following CSX or CSX merely following UP through parallel interdependence.  Before the March 12, 2003 meeting, CSX was planning to reduce fuel surcharge rates.  During the March 12, 2003 meeting, CSX and UP reached an agreement to impose fuel surcharges.  After the March 12, 2003 meeting, CSX and UP followed through and adopted the identical fuel surcharge program.

53.     During this same time period, the two other Defendants, BNSF and NS, were engaged in meetings regarding fuel surcharges.

54.     On March 18, 2003, BNSF and NS's senior management attended an in-person meeting. Among others, the following individuals from NS attended: Chairman David Goode ("Goode"), VP of Intermodal Mike McClennan ("McClennan"), and SVP of Marketing Services Don Seale ("Seale").  Among others, the following individuals from BNSF attended: Chairman

Matt Rose ("Rose"), Chief Marketing Officer John Lanigan ("Lanigan"), and VP of Consumer Products and Head of Intermodal Activities Steve Branscum ("Branscum").  At the meeting, BNSF and NS discussed how the four major railroads structured their fuel surcharge programs.  After the meeting, BNSF and NS adopted an "action item" stating: "BNSF's fuel surcharge is structured differently than NS, CSX, and UP.  Should BNSF's be synchronized with the other big players in the industry?"  This action item was assigned to BNSF's Lanigan and NS's Seale.

55.     On March 27, 2003, NS's Seale wrote to BNSF's Lanigan that at an upcoming trade association meeting, Seale wanted to discuss "the fuel surcharge issue we discussed in Norfolk."

56.     On April 1, 2003, BNSF's Lanigan and CSX's Chief Marketing Officer Mike Giftos met in Jacksonville, Florida to discuss "Fuel Surcharge."

57.     Around the same time, from April 2-6, 2003, an NFTA meeting took place at the Wigwam Resort in Litchfield Park, Arizona.  Each of the Defendants attended the meeting at Wigwam.  Almost immediately following the Wigwam meeting, BNSF issued a new internal directive adopting a stronger position on fuel surcharges: "Effective immediately and urgently per John Lanigan … Authority to omit FSC [fuel surcharge] provision is to be granted to VP's only (who will also clear with John)."

58.     As a result of agreements reached in early 2003, as described in this Complaint, BNSF, CSX, NS, and UP adopted virtually identical fuel surcharge programs and did not stray from these programs for the entire conspiracy.  This was intentional and coordinated on the part of the Defendants.

### B.     Pursuant to the Meetings in Early 2003, the Railroads Began to Coordinate Their Fuel Surcharges in Mid-2003

59.     The programs that the four Defendants adopted were similar if not virtually the same.  The only differences in their fuel surcharge programs concerned the indices used and the

thresholds chosen.  The Western Railroads (BNSF and UP) tied their fuel surcharge to the HDF Index, while the Eastern Railroads (CSX and NS) tied their programs to the WTI Index.

60.     Shortly after the spring 2003 NFTA meeting, and as early as July 2003, the two Western Railroads (BNSF and UP) began to coordinate their fuel surcharges.  Prior to July 2003, the UP fuel surcharge had been adjusted monthly based on the WTI Index, while the BNSF fuel surcharge had been based on the HDF Index.  As a result of the unlawful agreement, the Western Railroads began imposing the same fuel surcharges at the same time and in the same amount.

61.     BNSF and UP agreed to use the HDF Index in virtually the same way.  Whenever the average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no surcharge was applied.  When the HDF Index exceeded this threshold, both BNSF and UP applied a surcharge of 0.5% for every five-cent increase above the threshold.  So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply a surcharge of 2%.  In other words, the surcharge would increase 2% for every 20-cent increase in the HDF Index.

62.     Not only did BNSF and UP coordinate *how* they applied the fuel surcharge, but they also coordinated *when* they would apply the fuel surcharges.  As a result of the unlawful agreement, BNSF and UP decided to apply the fuel surcharges to shipments beginning the second month after the month in which there was a change in the HDF Index average price.  For example, if the HDF Index average price changed in February, BNSF and UP would announce their new fuel surcharge percentage on March 1, and then apply the surcharge to shipments in April.  Defendants published these new fuel surcharges on their websites, which made deviation from the conspiracy pricing readily apparent.

63.     The adoption of virtually identical and complex fuel surcharge programs demonstrates that these surcharge programs were the result of a conspiratorial agreement among

Defendants rather than independent responses to common market issues such as increasing fuel costs.

64.     UP's decision to use the HDF Index (the same Index used by BNSF) in July 2003 is strong evidence of coordinated conduct because two months earlier, in April 2003, UP had announced changes to its trigger point but did not change the index it was using.  The fact that UP switched to the HDF Index in July 2003 and began levying identical surcharges to BNSF is further evidence that UP was acting according to a conspiratorial agreement.

65.     A few months after the Western Railroads announced their coordinated surcharge programs, the two Eastern Railroads (CSX and NS) began to use the WTI Index to levy identical surcharges on their customers.  This new surcharge program was the result of the unlawful agreement that Defendants reached in the spring of 2003.

66.     CSX and NS agreed to apply identical surcharges based on the WTI Index. Whenever the WTI Index exceeded $23 per barrel of crude oil, CSX and NS's rates were increased by 0.4% for every $1 that the price of WTI oil exceeded $23 per barrel.  For example, if the price of WTI oil was $28 per barrel, the fuel surcharge would be 2%.  In other words, the fuel surcharge would be adjusted upward by 2% for every $5 increase in WTI average price.

67.     Not only did CSX and NS coordinate *how* they applied the fuel surcharge, but they also coordinated *when* they would apply the fuel surcharges – two calendar months after the WTI had adjusted, thereby adopting the same schedule that the Western Railroads had adopted.  For example, if the WTI Index average price exceeded $23 in February, CSX and NS would assess the applicable fuel surcharges in April.  CSX and NS published their fuel surcharges on their website, making deviation from conspiracy pricing readily apparent.

68.     This fuel surcharge program was clearly the result of a conspiratorial agreement among Defendants.  The programs were too complex and precise to be the result of unilateral action.

C.      **Defendants Removed an Obstacle to the Conspiracy**

69.     Around the same time that the Defendants announced their new fuel surcharge programs, they conspired to remove a major obstacle to their price-fixing conspiracy – the RCAF and the AII, the two cost escalation provisions that would make it difficult for them to justify stand-alone fuel surcharges.

70.     The AII was published by the AAR.  As of 2003, the AII already accounted accurately for the impact of any fuel cost increase.  Accordingly, any actual increase in fuel costs (no matter how large) would be contained in the AII.  As of 2003, many private freight contracts contained provisions that were linked to the AII.  This made it difficult for Defendants to impose stand-alone fuel surcharges because imposing a separate fuel surcharge when fuel costs were already covered by the RCAF or the AII would be perceived by customers as double recovering for fuel costs.  Accordingly, in order to carry out their plan, Defendants needed to find a way to justify stand-alone fuel surcharges.

71.     Their solution was to force the AAR to adopt a new cost escalation provision, which removed fuel, thereby allowing them to justify stand-alone fuel surcharges.  Because of their size, the four Defendants dominated the AAR board.

72.     AAR board meetings and discussions took place in October and December 2003. During these meetings, BNSF, CSX, NS and UP used their influence to cause the AAR to adopt a new cost escalation index called the All Inclusive Index Less Fuel ("AIILF").  This index was virtually identical to the AII except it removed fuel, thereby opening the door for Defendants to

begin assessing separate fuel surcharges.  The underlying decision to create this new index was the result of Defendants' coordinated actions and an important step in Defendants' conspiratorial plan.

73.     Not only was removing fuel from the AII a necessary step in making the conspiracy effective, it was also an unprecedented move by the AAR, one that only could be achieved by coordinated conduct among the four Defendants.  The monumental nature of this achievement was documented in a letter from BNSF's chief economist: "In December 2003 [Matt Rose, BNSF's Chief Executive Officer] single-handedly got the A.A.R. to establish [the AIILF].…  **In my 18-year railroad career, no one had ever succeeded in steering the A.A.R. to do this**….  [T]he combination of sound price escalation using this index and a fuel surcharge should tremendously help our bottom-line for years to come.  In fact, … the entire rail industry should benefit from the escalation options the index provides." (emphasis added).

74.     There was no legitimate business justification for the coordinated action by the four Defendants to remove fuel from the AII.  They could not justify the coordinated adoption of the AIILF as a more efficient cost recovery mechanism for fuel because the AII (and the related RCAF) <u>already</u> acted as mechanisms for Defendants to recover their <u>actual</u> fuel costs.  Their sole motivation in causing the AAR to adopt the AIILF was so that they could use fuel surcharges as "profit centers" to make more money.  With the AII and RCAF now extinct, Defendants could apply the fuel surcharges under the guise of recovering fuel costs.  However, their own statements demonstrate that they were using the fuel surcharge programs (the details of which they agreed to) as revenue generators, not cost recovery mechanisms.  For example, an internal BNSF memorandum noted that: "Eastern Railroads [CSX and NS] have a 'profit center' with their Fuel Surcharge Programs…."  Additionally, another BNSF employee described the company's fuel

20

surcharge program as "a revenue maximization program, not protection against fuel prices." Similarly, the other companies recognized that the program was solely meant to generate revenue. In a form 10-K, CSX noted that its "primary components of the revenue gain were continued yield management and the Company's fuel surcharge program, which drove revenue per unit across all major markets." NS employees echoed this sentiment as well: "[I]t seems like all the Merchandise rev/car increases are coming from fuel surcharges."

75.     As evidenced by the statements above, the actions of Defendants in adopting virtually identical fuel surcharge programs and creating the AIILF were not unilateral responses to the common issue of increasing fuel costs. Instead, the purpose in taking these collective actions was to dramatically and unlawfully increase Defendants' profits at the expense of their customers.

### D.     Defendants Began Imposing the New Fuel Surcharges, Which Were More Aggressive, Uniformly Applied, and Non-Negotiable

76.     As alleged earlier, prior to 2003, Defendants had difficulty imposing fuel surcharges because they were afraid that if they strictly imposed fuel surcharges, they would lose business to railroads that did not impose the costly surcharges. However, this changed after Defendants entered into the unlawful agreement in 2003. They began applying aggressive fuel surcharges in lockstep, and Defendants rarely (if ever) offered exceptions to their fuel surcharge policy. As shown by Defendants' previous statements and actions, a strict adherence to a "no fuel surcharge exceptions" policy would have been against each Defendant's self-interest if taken unilaterally and without advance agreement that all Defendants would adhere to the fuel surcharge agreement.

77.     These conspiratorial surcharges were incredibly aggressive because they were applied to entire base rates. Following the conspiratorial publication of the AIILF, Defendants began to impose the fuel surcharges as separate items on their customers' bills. As alleged earlier,

21

Defendants imposed these surcharges as a percentage multiplier of the total base rate for the rail freight transportation.  By way of illustration, suppose that fuel costs accounted for 30% of Defendants' total cost of providing rail freight services, and the applicable fuel index increased by 10%.  In that instance, Defendants would increase their total charge by 10%, even though their costs only went up by 3%.  In other words, pursuant to their agreement, Defendants applied the supposed fuel cost increase percentage to the entire cost of a freight shipment (notwithstanding the fact that fuel only accounts for a portion of the costs of shipment).  This agreed upon approach yielded Defendants billions in profits.

78.    Additionally, these conspiratorial surcharges were more aggressive than pre-conspiracy surcharges because these new surcharges had lower trigger prices and they were adjusted based on the 30-day average fuel price.  In the past, adjustments were only made when the trigger price was exceeded for 30 (or more) consecutive days.  In other words, unlike the old fuel surcharges, which required the price of oil to exceed the threshold price ($28 per barrel under the old program) for 30 consecutive days, the new program would be triggered at $23 per barrel and would be based on the average price of oil for the preceding month.  At least one executive noted that the lower trigger price and the use of the average price netted Defendants an incredible amount of revenue.  NS's Pricing System Manager described the new program in an internal NS e-mail: "By dropping the base to $23 per barrel [from $28 per barrel], raising the percentage yield and [taking] it sooner, the change is in fact a blatant general rate increase…."

79.    Furthermore, Defendants' new "zero exception" policies demonstrated that these new fuel surcharge programs were the result of a conspiracy to fix prices.  Prior to 2003, Defendants had difficulty imposing fuel surcharges because customers resisted them.  As one company noted in 2002: "The trucking industry uses fuel surcharges but our rail competitors do

not and we therefore are hard pressed to achieve it.  We do loose [sic] business because of that and

we may have to lower margin in other aspects in order to keep the business with surcharges where

we do apply it."

80.     In agreeing to collude on fuel surcharges, each Defendant was acting against its

independent short-term, economic self-interest.  In a competitive environment free of collusion,

carriers with lower fuel costs could impose a lower surcharge and thereby increase market share

at the expense of competing railroads.  However, rather than engage in such competitive behavior,

Defendants instead restricted their freedom to price competitively and adhered to an industry-wide

pattern of uniform fuel surcharge pricing based on the total cost of the freight.

81.     Defendants' restriction of pricing freedom is evidenced by, among other actions,

their new policies that were put in place immediately after the unlawful agreement and their

unwavering adherence to these policies.  All of Defendants' policies mandated that fuel surcharges

be included in all contracts.  As of January 2004, BNSF's pricing guidelines stated: "Every

Contract should include a fuel surcharge clause.  All new and renewing contract negotiations

should have a fuel surcharge as the goal."  NS's Vice President acknowledged that "there was a

policy [at NS] to apply the standard fuel surcharge to as many customers as possible."  A CSX

employee noted that "[t]he new price vehicle should incorporate [CSX's] [fuel surcharge]

program."  Internal UP e-mails stated that: "all contracts without fuel language will have fuel

language upon renewal.  This is a mandate by UP management."

82.     These policies were not empty directives.  Far from it.  Defendants did not offer

discounts to their customers even when doing so would have made sense in a healthy and

competitive market, allowing them to increase market share at the expense of competing railroads

who were imposing high surcharges.  As a result of their unlawful agreement, Defendants all

strictly followed the conspiracy pricing, refusing to offer any material discounts to shippers.  A BNSF employee's staff meeting notes indicated that BNSF was following the conspiracy pricing.  The employee wrote: "[There are] [v]irtually no exceptions" to fuel surcharge adherence and "business units have done an excellent job in [fuel surcharge] adherence."  A CSX executive noted that his goal was to have "zero exceptions" when applying fuel surcharges to contracts.  In an internal e-mail, an NS employee wrote: "There are relatively few [NS] publications with no [fuel surcharge]…."

83.     Again, this no-exception policy, adopted and followed by all of the Defendants, would not make economic sense in the absence of a conspiracy.  Anecdotal evidence of shippers also supports the notion that Defendants were adhering to a conspiratorial agreement.  Shippers from different industries tried to negotiate fuel surcharges but were told by Defendants (who had previously been willing to negotiate discounts) that the fuel surcharges were not negotiable.

**E.     The Fuel Surcharge Percentages Charged by the Railroads Were Similar if not Virtually Identical For the Entire Conspiracy and Affected Intermodal Traffic and Captive Shippers**

84.     The first chart below shows that the fuel surcharge percentages charged by the Western Railroads (BNSF and UP) varied before the conspiracy but were virtually identical starting in July 2003.  The second chart shows that the fuel surcharge percentages charged by the Eastern Railroads (CSX and NS) varied before 2004 but were virtually identical starting in March 2004.

## MONTHLY SURCHARGE PERCENTAGES -- WESTERN RAILROADS

| MONTH | BNSF | UP | MONTH | BNSF | UP |
|---|---|---|---|---|---|
| Jun-02 | 1.0% | 0 | Jun-05 | 10.5% | 10.5% |
| Jul-02 | 1.0% | 0 | Jul-05 | 9.5% | 9.5% |
| Aug-02 | 0 | 0 | Aug-05 | 10.5% | 10.5% |
| Sep-02 | 0 | 0 | Sep-05 | 11.5% | 11.5% |
| Oct-02 | 1.0% | 0 | Oct-05 | 13.0% | 13.0% |
| Nov-02 | 2.0% | 0 | Nov-05 | 16.0% | 16.0% |
| Dec-02 | 2.5% | 0 | Dec-05 | 18.5% | 18.5% |
| Jan-03 | 2.0% | 2.0% | Jan-06 | 13.5% | 13.5% |
| Feb-03 | 2.0% | 2.0% | Feb-06 | 12.0% | 12.0% |
| Mar-03 | 2.5% | 2.0% | Mar-06 | 12.5% | 12.5% |
| Apr-03 | 4.5% | 2.0% | Apr-06 | 12.5% | 12.5% |
| May-03 | 2.0% | 2.0% | May-06 | 13.5% | 13.5% |
| Jun-03 | 3.0% | 2.0% | Jun-06 | 15.0% | 15.0% |
| Jul-03 | 2.5% | 2.5% | Jul-06 | 16.5% | 16.5% |
| Aug-03 | 2.0% | 2.0% | Aug-06 | 16.5% | 16.5% |
| Sep-03 | 2.0% | 2.0% | Sep-06 | 17.0% | 17.0% |
| Oct-03 | 2.5% | 2.5% | Oct-06 | 18.0% | 18.0% |
| Nov-03 | 2.5% | 2.5% | Nov-06 | 15.5% | 15.5% |
| Dec-03 | 2.5% | 2.5% | Dec-06 | 13.0% | 13.0% |
| Jan-04 | 2.5% | 2.5% | Jan-07 | 13.0% | 13.0% |
| Feb-04 | 2.5% | 2.5% | Feb-07 | 14.0% | 14.0% |
| Mar-04 | 3.5% | 3.5% | Mar-07 | 12.5% | 12.5% |
| Apr-04 | 3.5% | 3.5% | Apr-07 | 12.5% | 12.5% |
| May-04 | 4.0% | 4.0% | May-07 | 14.5% | 14.5% |
| Jun-04 | 4.5% | 4.5% | Jun-07 | 16.0% | 16.0% |
| Jul-04 | 5.0% | 5.0% | Jul-07 | 15.5% | 15.5% |
| Aug-04 | 5.0% | 5.0% | Aug-07 | 16.0% | 16.0% |
| Sep-04 | 5.0% | 5.0% | Sep-07 | 16.5% | 16.5% |
| Oct-04 | 6.0% | 6.0% | Oct-07 | 16.5% | 16.5% |
| Nov-04 | 7.0% | 7.0% | Nov-07 | 17.5% | 17.5% |
| Dec-04 | 9.0% | 9.0% | Dec-07 | 18.5% | 18.5% |
| Jan-05 | 9.0% | 9.0% | Jan-08 | 21.5% | 21.5% |
| Feb-05 | 8.0% | 8.0% | Feb-08 | 21.0% | 21.0% |
| Mar-05 | 7.5% | 7.5% | Mar-08 | 21.0% | 21.0% |
| Apr-05 | 8.0% | 8.0% | Apr-08 | 21.5% | 21.5% |
| May-05 | 10.0% | 10.0% | May-08 | 26.5% | 26.5% |

25

MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2.0% |
| Jul-03 | 2.4% | 2.0% |
| Aug-03 | 3.2% | 2.0% |
| Sep-03 | 3.2% | 2.0% |
| Oct-03 | 3.6% | 2.0% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2.0% |
| Mar-04 | 4.8% | 4.8% |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |

| MONTH | CSX | NS |
|---|---|---|
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

85.     The foregoing uniform pricing for more than four years is not explained by any legitimate business justification nor was it a common response to the problem of rising fuel costs. As alleged in this Complaint, any actual fuel cost increases experienced by Defendants would have been covered by the AII.

86.     While the above formulae and percentages reflect the fuel surcharges applied by Defendants to their carload businesses (*i.e.*, shipments that travel from origin to destination only by railcars), Defendants also coordinated with respect to the fuel surcharges applied to their intermodal business (*i.e.*, shipments that travel by rail and one other mode of transportation such as truck or ship).

26

87.   The direct heads of Defendants' intermodal businesses attended anticompetitive meetings.  NS's VP of Intermodal Mike McClellan and BNSF's VP of Consumer Products and Head of Intermodal Activities Steve Branscum participated in the March 2003 meeting in which NS and BNSF discussed how the fuel surcharge programs of all four Defendants were structured, and then adopted an action item for BNSF and NS senior executives to address synchronizing their fuel surcharge programs with the other Defendants.

88.   Moreover, the same senior executives who conspired to impose supra-competitive fuel surcharges on their carload businesses led Defendants' intermodal businesses.  In other words, Defendants' price-fixing agreements applied to intermodal shipping as well.

89.   Furthermore, Defendants imposed standard fuel surcharges on all shippers without regard to whether the shipper had access to alternative modes of transportation.   In written testimony submitted to Congress, NS's Chairman Moorman recognized that even so-called "captive" shippers (those shippers who do not have alternative modes of transportation) have leverage in negotiating a better rate at these "captive" locations:

> Most large companies have multiple rail-served facilities with some of the facilities served by one railroad, some facilities served by another railroad and some facilities served by two railroads.  The customer uses its traffic at the dually served facilities to negotiate a better rate/service package on traffic at the single served facilities.  That is one source of leverage.  Another source is product competition.  For example, assume we are the sole serving carrier at a chemical plant that ships to numerous receivers.  When the receiver can use another product in lieu of the one produced at our solely served facility, we will lose the business. ...  Another major source of competition is geographic competition. ...  In short, even where there is only one railroad serving a facility, there are market factors at play.  These competitive constraints are real.

90.   Before the conspiracy, captive shippers could negotiate out of fuel surcharges.  But during the conspiracy, they could not.

91.   Defendants' conspiratorial goal was clear.  They sought to reap billions in profits for themselves – and they did because of their conspiracy.  As a means to this end, they used rising

fuel costs as a pretext to enact a misleading fuel surcharge program.  They enacted identical fuel surcharge programs, removed fuel from the long-used cost escalation index, applied their fuel surcharges to base rates, and refused to offer discounts or otherwise negotiate around these surcharges.  In the end, Defendants reaped the rewards of this conspiracy, making billions in profits at the expense of shippers, including the Plaintiff.

## VIII.   THE RAIL FREIGHT INDUSTRY IS SUSCEPTIBLE TO PRICE FIXING

92.    Defendants' anticompetitive conduct constitutes a conspiracy to fix prices, which is a *per se* violation of Section 1 of the Sherman Act.  Therefore, Plaintiff need not define a relevant market.  There are, however, features of the market relevant to this case that show both: (i) that the market is susceptible to collusion, and (ii) that the fuel surcharge programs were in fact the result of collusion and not the result of conscious parallelism, price-matching, or follow-the-leader pricing.

93.    The U.S. market for rail freight has been characterized by numerous factors that make the industry susceptible to price fixing, including, without limitation, the following: (1) industry concentration; (2) substantial barriers to entry; (3) demand inelasticity; and (4) well-understood and easily communicated pricing channels.

94.    Since 1975, consolidation has reduced the number of competitors in the railroad industry, which has rendered the market ripe for collusion.  In 1975, there were 56 Class I railroads. Today, there are only 7 Class I railroads.  Thus, the market for rail freight in the United States is extremely concentrated.  Additionally, the four Defendants control about 90% of rail freight track miles.  While the numbers were small enough to foster collusion, the number of competitors was enough to suggest that, absent collusion, fuel surcharges would not have been imposed in such a uniform and aggressive method.

95.     Barriers to entry increase a market's susceptibility to a coordinated effort to maintain supra-competitive prices because it is difficult for new companies to enter the market and destabilize coordinated supra-competitive prices.  High fixed costs to create and maintain railroad infrastructure create substantial barriers to entry in the rail freight industry.

96.     A price fixing conspiracy is most effective when the demand for the conspirators' services is inelastic.  This means that the conspirators can sustain supra-competitive prices without enough customers leaving so as to make the price increase unprofitable.  Defendants' businesses are concentrated in commodities and distances over which rail is the most cost-efficient transport option and, therefore, the demand they faced was in general inelastic.

97.     Furthermore, railroads use common pricing documents that allowed Defendants to monitor each other's pricing actions during the conspiracy.

98.     The sheer complexity and uniqueness of the fuel surcharge programs involved in this case further demonstrates that these programs were not the result of independent actions but were the result of an unlawful agreement.

99.     Taken together, these facts show that the U.S. market was susceptible to price fixing, and that Defendants seized on this susceptibility to enact their own unlawful scheme, reaping billions of dollars in profits.

IX.     **THE SURFACE TRANSPORTATION BOARD DECISION AND THE HISTORY OF PRIOR CASES**

100.    As previously alleged, shippers of both rate-regulated and rate-unregulated traffic were affected by the artificially high fuel surcharges imposed by Defendants' conspiracy.  Shippers of rate-regulated traffic complained to the Surface Transportation Board in 2006.  Shippers of rate-unregulated traffic had similar complaints.

101.   In 2006, shippers of rate-unregulated traffic complained that the fuel surcharges imposed on them were unreasonable.  The STB instituted a proceeding to inquire into these fuel surcharge practices.  The STB proceeding and ultimate decision related only to rate-regulated traffic, not rate-unregulated traffic that is the subject of this Complaint.  However, as the fuel surcharges applied to rate-regulated traffic are the same fuel surcharges applied to rate-unregulated traffic, the STB decision further indicates that Defendants entered into an agreement to restrain trade in violation of the antitrust laws.

102.   The STB held proceedings in mid-2006 and released an opinion in January 2007, concluding: "[I]t is an unreasonable practice to compute fuel surcharges as a percentage of the base rates.  Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as a cost recovery mechanism.  Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied.  Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because for example it has fewer transportation alternatives) it will pay dramatically more in fuel surcharges."  *Rail Fuel Surcharges*, Ex. Parte No. 661, 2007 WL 201205, at *4 (S.T.B. Jan. 26, 2007).  Further, the Court noted that "imposing rate increases in this manner, when there [was] no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge [was] applied, is a misleading and ultimately unreasonable practice."  *Id.* at *4.[3]

---

[3]       While the STB opinion and findings are non-binding on a federal district court, these findings bolster Plaintiff's claims that Defendants entered into an agreement to restrain trade.

103.    While the STB did not prohibit the use of fuel surcharges, it cautioned the railroads that any surcharge imposed must have "a reasonable nexus to fuel consumption."  *Id*. at *6.

104.    Pursuant to their conspiracy, Defendants applied the same misleading and unreasonable fuel surcharge practices described above to private rail-freight transportation contracts, thus injuring Plaintiff in this case and causing it to pay supra-competitive prices for rail transportation services.

## X.    DEFENDANTS' CONSPIRACY WAS HIGHLY EFFECTIVE

105.    As a proximate result of this conspiracy, and during the time period relevant to Plaintiff's claims, Defendants and co-conspirators charged Plaintiff and others in the United States supra-competitive prices (*i.e.*, prices above a competitive level) for rail transportation services.

106.    Defendants and co-conspirators' conspiracy alleged in this Complaint overcharged Plaintiff on rail freight transportation services that Plaintiff directly purchased from one or more Defendants and co-conspirators

107.    As alleged above, Defendants reaped huge profits from the unlawful fuel surcharges.  As the head of UP, James Young, admitted in 2007, "three, four years ago [the fuel surcharges] were really non-existent" and "it's only been the last couple of years … that the financial returns in this business [have] started to move in the right direction."

108.    As a result of the unlawful conduct, combination, or conspiracy alleged in this Complaint: (a) the fuel surcharges charged to Plaintiff for unregulated rail freight transportation services have been fixed, maintained, increased, or stabilized at supra-competitive levels; (b) Plaintiff has been deprived of the benefits of free and unrestricted competition in the market for unregulated rail freight transportation services; and (c) competition in establishing prices paid,

customers of, and territories for unregulated rail freight transportation has been suppressed, restrained, and/or eliminated.

## XI.   DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY

109.   Discovery is necessary to determine the full scope of the conspiracy, including the time frame and participants.  Plaintiff reserves the right to amend or supplement this Complaint to add other Defendants, claims, time period, or other allegations based upon discovery and further investigation.

## XII.   TOLLING OF THE STATUTE OF LIMITATIONS

110.   The filing of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action. *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974); *Crown v. Parker*, 462 U.S. 345, 350 (1983).  The mere fact that a federal statute providing for substantive liability also sets a time limitation upon the institution of suit does not restrict the power of the federal courts to hold that the statute of limitations is tolled under certain circumstances not inconsistent with the legislative purpose. *American Pipe*, 414 U.S. at 559.  A class complaint notifies defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential Plaintiff who may participate in the judgment. *Id.* at 555.  Defendants will be aware of the need to preserve evidence and witnesses respecting the claims of all the members of the class.  Tolling the statute of limitations thus creates no potential for unfair surprise, regardless of the method class members choose to enforce their rights upon denial of class certification. *Crown v. Parker*, 462 U.S. 345, 352-353 (1983).  Once the statute of limitations has been tolled, it remains tolled for all members of the putative class for a reasonable period after class certification is conclusively denied.  At that point, class members may choose to

file their own suits and be afforded a sufficient opportunity to investigate, prepare and file their claims. *Id.* at 354.

111.    On May 14, 2007 a first class action suit (*Dust Pro, Inc. v. CSX Transportation, Inc., et al.*, D.N.J., No. 2:07-cv-02251-DMC-MF) ("*Dust Pro*") was filed against Defendants and others on behalf of a class that included direct purchasers of unregulated rail freight transportation services from Defendants and others from July 1, 2003 until at least May 14, 2007 and who were assessed a rail fuel surcharge for the agreed-upon transportation. The class action alleged that Defendants conspired to use rail fuel surcharges, which were added to customers' bills, as a means to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States. Plaintiff was a member of the putative class.

112.    On November 6, 2007, the Multidistrict Litigation Panel consolidated all 18 pending actions, including *Dust Pro*, before the District of District of Columbia under the caption *In Re: Rail Freight Fuel Surcharge Antitrust Litigation* (*see* D.D.C., No. 1:07-mc-00489-PLF, ECF No. 1).

113.    In 2012, the District Court initially granted a motion to certify the direct purchaser class. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1 (D.D.C. 2012). However, on appeal, the United States Court of Appeals for the District of Columbia Circuit reversed and vacated the certification ruling and remanded for further consideration. (*In re Rail Freight Surcharge Antitrust Litig. MDL No. 1869*, 725 F.3d 244 (D.C. Cir. 2013).

114.    On October 10, 2017, the District Court on remand <u>denied</u> a motion for certification of the direct purchaser class, *In re Rail Freight Surcharge Antitrust Litig.,* 292 F. Supp. 3d 14 (D.D.C. 2017), and class Plaintiffs subsequently appealed that decision to the Court of Appeals.

115.   On November 8, 2017 – during the pendency of the class Plaintiffs' Rule 23(f) Petition to the Court of Appeals – the District Court entered an Order staying the case until the earlier of: (a) denial of Plaintiffs' Petition by the Court of Appeals, or (b) January 5, 2018 and further stated that:

> "It is not necessary for the Court to address at this time [class] Plaintiffs' request for tolling, because Defendants have agreed, for claims previously tolled by the pendency of the class action, to exclude from future statutes of limitations calculations the time between (i) the date of the court's order denying class certification and (ii) the earlier of either the date when the pending Rule 23(f) Petition may be denied or January 5, 2018, for actions filed after the date in clause (ii)."

116.   On December 20, 2017, the Court of Appeals granted the class Plaintiffs' Rule 23(f) Petition. *In re Rail Freight Surcharge Antitrust Litig.*, No. 17-8005 (D.C. Cir.).

117.   On January 8, 2018 – during the pendency of the appeal – the District Court entered a Stipulation and Second Order on Plaintiffs' Motion for a Stay of Proceedings and to Toll The Statute of Limitations, *see* D.D.C., No. 1:07-mc-00489-PLF, ECF No. 856, pending the appeal of the class Plaintiffs pursuant to Fed. R. Civ. P. 23(f).  The Stipulation and Order states in pertinent part:

> The Court again acknowledges Defendants' representation regarding future statute of limitations calculations and, on the basis of that representation, again concludes that it is not necessary at this time to decide.
>
> (1) whether to enter an order extending tolling under the *American Pipe* doctrine beyond the date of the Court's order denying class certification, *see Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974), or (2) whether the Court has the power to enter such an order.
>
> Now, therefore, the Court ORDERS as follows:
>
> [Class] Plaintiffs need not renew their request for tolling at this time because Defendants have agreed, for claims previously tolled by the pendency of the class action, to exclude from future statutes of limitations calculations the time between (i) the date of the court's order denying class certification and (ii) the date that the Court of Appeals issues its merits-panel decision on [Class] Plaintiffs' appeal, for actions that are filed after

the date in clause (ii).   This determination is without prejudice to Plaintiffs renewing their request  at a future date.

*Id.* at 3.

118.   On August 16, 2019, the Court of Appeals affirmed the District Court's 2017  denial of class certification.  *In re Rail Freight Surcharge Antitrust Litig.*, No. 18-7010  (D.C. Cir.).

119.   Accordingly, at a minimum, the period between October 10, 2017 (the date of the District  Court's order denying class certification) and August 16, 2019 (the date that the Court of Appeals issued its decision to affirm the District Court's denial of class certification) must be excluded from the statutes of limitations calculation for individual actions – such as this one – that are filed after August 16, 2019.

120.   In addition to the above, other court orders, stipulations, or agreements may be relevant to the application of the statute of limitations to Plaintiff's claims.

## COUNT I

### (Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act)

121.   Plaintiff incorporates by reference each of the paragraphs alleged above.

122.   Beginning in or about 2003 and continuing in force or effect, or both, through 2008, with an effect that continued thereafter, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of unregulated rail freight transportations services in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

123.   This contract, combination or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, increased and/or standardized prices for fuel surcharges for rail freight transportation handled through private contracts and other means exempt from regulation.   This contract,

combination or conspiracy constitutes a *per se* violation of trade and is, in any event, an unlawful restraint of trade.

124.    Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce.  As alleged above, Defendants' unlawful conduct was carried out through mutual understandings and agreements.

125.    This contract, combination or conspiracy in restraint of trade has had the following effects: (a) the fuel surcharges charged to Plaintiff for unregulated rail freight transportation services have been fixed, increased, maintained and/or stabilized at supra-competitive levels; (b) Plaintiff has been deprived of the benefits of free and unrestricted competition in the market for unregulated rail freight transportation services; and (c) competition in establishing prices paid, customers of, and territories for unregulated rail freight transportation has been suppressed, restrained, and/or eliminated.

126.    Plaintiff has been injured in its business or property by reason of Defendants' antitrust violations in amounts not yet ascertained.  Plaintiff's injury as a direct purchaser of the unregulated rail freight is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

## XIII.   **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff prays for the following relief:

A.    A jury verdict in the amount of the compensatory damages sustained by Plaintiff.

B.    A judgment against Defendants, jointly and severally, by the Court in treble the amount of the jury verdict, in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15, and for attorney's fees, costs and interest as allowable by law.

C.    A permanent injunction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining Defendants from future violations of the antitrust laws and from practices that facilitate those violations.

D.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated: June 8, 2020                              Respectfully submitted,

                                                 */s/Robert D. W. Landon, III*
                                                 Robert D. W. Landon, III
                                                 Richard Alan Arnold*
                                                 William J. Blechman*
                                                 Douglas H. Patton*
                                                 Michael A. Ponzoli *
                                                 Joshua B. Gray*
                                                 Brandon S. Floch*
                                                 KENNY NACHWALTER, P.A.
                                                 1441 Brickell Avenue
                                                 Suite 1100
                                                 Miami, Florida  33131
                                                 Tel:  (305) 373-1000
                                                 Fax:  (305) 372-1861
                                                 E-mail:   rlandon@knpa.com
                                                           rarnold@knpa.com
                                                           wblechman@knpa.com
                                                           dpatton@knpa.com
                                                           mponzoli@knpa.com
                                                           jgray@knpa.com
                                                           bfloch@knpa.com

                                                 ***Counsel for Plaintiff Lehigh Hanson, Inc.***

                                                 ***(Pro hac vice* forthcoming)**

620574.6